**TRYCO TRUCKING COMPANY, INC., and Ralph O. Soots, Plaintiffs,**

v.

**BELK STORES SERVICES, INC., Charlotte Freight Association, Inc., CFA Transportation, Inc., Tempus Trucking Company, Robert B. Hoagland, and Charles R. Young, Defendants.**

No. C–C–84–531–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

May 7, 1986.

Eric Meierhoefer, Mark A. Michael, Badger, Johnson, Chapman & Michael, Charlotte, N.C., for plaintiffs.

E. Osborne Ayscue, Jr., Helms, Mulliss & Johnston, Philip D. Lambeth, Harkey, Coira, Fletcher & Lambeth, Robert D. Hoagland, E. Fitzgerald Parnell, III, Weinstein, Sturges, Odom, Groves, Bigger, Jonas & Campbell, H. Parks Helms, Land & Helms, William P. Farthing, Parker, Poe, Thompson, Bernstein, Gage & Preston, Charlotte, N.C., for defendants.

## MEMORANDUM OF DECISION

ROBERT D. POTTER, Chief Judge.

THIS MATTER was heard before the undersigned on March 25, 1986 on Defendants' Motion for summary judgment. Plaintiffs Tryco Trucking Company, Inc. ("Tryco") and Ralph O. Soots ("Soots") were represented by Attorney Mark A. Michael. Defendant Belk Stores Services, Inc. ("Belk") was represented by Attorney W. Donald Carroll, Jr. Defendant Charlotte Freight Association ("CFA") was represented by Attorney Philip D. Lambeth. Defendant CFA Transportation, Inc. ("CFA Transportation") was represented by Attorneys Philip D. Lambeth and Robert F. Rush. Defendant Tempus Trucking Company ("Tempus") no longer exists as a legal entity, has not made an appearance in this action and was not represented at the hearing. Defendant Robert D. Hoagland ("Hoagland") was represented by Attorney E. Fitzgerald Parnell, III. Defendant Charles R. Young ("Young") was represented by Attorney William P. Farthing.

Fed.R.Civ.P. 56 states that the Court may grant summary judgment if there is not a genuine issue as to any material fact and a party is entitled to a judgment as a matter of law. The evidence presented to the Court, including any legitimate inference, must be construed in the light most favorable to the non-moving part. *Taylor v. Chesapeake and Ohio Railway Co.*, 518 F.2d 536 (4th Cir.1975). After carefully considering the matter, including the depositions, affidavits, exhibits, and memoranda, the Court is of the opinion that Plaintiffs' evidence has not raised a genuine issue of material fact as to their claims under 18 U.S.C. § 1961, *et seq.*—Racketeer Influenced and Corrupt Organizations Act ("RICO"), and Defendants are entitled to judgment as a matter of law. The Court further concludes that since the Plaintiffs' RICO claims fail, then Plaintiffs' claim for relief for unfair trade practices should be dismissed for lack of subject matter jurisdiction in that the unfair trade practices claim is based on state law and could not be heard before this Court if it were not for the pendent jurisdiction conferred by the federal RICO claims. *See Reamer v. United States*, 459 F.2d 709 (4th Cir.1972).

## STATEMENT OF THE CASE

Tryco incorporated as a North Carolina corporation in 1979, its sole shareholder

and president being Soots. Belk was Tryco's only customer until 1980 when Tryco obtained ICC authority to haul freight for CFA. Young first suggested that Soots obtain the CFA business for Tryco. However, neither Belk nor CFA ever had any contractual obligations to use Tryco as their carrier.

CFA was supervised by its general manager, Harold Barkley ("Barkley") until June, 1982 when he was replaced by John Jones. Hoagland represented CFA and played a major role in CFA's business structure. CFA and Tryco shared office space in the same location in Charlotte.

In July 1980, Tryco obtained ICC authority to haul for more customers, which it did. Tryco's other new customers included Greater Atlanta Shippers Association, the Orlando Freight Association, the Gulf Freight Association, the Greater Miami Shipping Association and Belk's business extended to all 48 states in the continental United States. To accommodate this rapid growth, Tryco bought 25 trailers and leased 55 more in addition to 30 to 40 tractors. Tryco also entered into leasing agreements with independent contract truckers who did not have their own ICC authority.

In January 1981, Plaintiffs allege Defendants attempted to extort 40 percent of Tryco's stock from Soots. At a meeting attended by Soots, Barkley, Young and Ed Redwine, of the Greater Atlanta Shippers Association, Plaintiffs allege Barkley demanded that Soots give Barkley, Redwine, and Young 40 percent of Tryco's stock, and that Soots refused. Upon subsequent requests made by Barkley on several occasions, Soots maintained his refusal.

Barkley, Redwine, and Young, on the other hand, contend that the January 1981 meeting dealt with the problem of Tryco's double-billing of the Greater Atlanta Shippers Association, co-loading and other service problems and that the subject of Tryco stock was not discussed.

In 1979, Soots, Barkley, and Hoagland, had formed Tryco Cartage to perform local deliveries for CFA. Hoagland paid $5,000 for 20 percent of its stock, and Soots and Barkley each paid $10,000 for 40 percent. Plaintiffs contend that Barkley's $10,000 represented not only his investment, but also that of Young and Redwine.

In 1981, Hoagland charged that Tryco was taking business of Tryco Cartage. Soots' response was that Tryco could do the work of CFA more efficiently.

According to Barkley, he did not know Tryco Cartage was a separate company from Tryco when he invested in it and thought that his investment would carry over into Tryco when Tryco began taking over more of CFA's business. When Barkley discovered that this was not the case, he felt he was entitled to 40 percent of Tryco's stock to make up for his investment in Tryco Cartage.

Soots resigned as president of Tryco Cartage in response to the charges of self-dealing. Hoagland sold his stock back to Soots. Barkley, however, allegedly continued requesting stock in Tryco but Soots maintained his refusal. Finally, Soots agreed to have Tryco Cartage purchase Barkley's 40 percent interest for $2,500. By mid-1981, Tryco had completely taken over Tryco Cartage's business and Tryco Cartage ceased to operate.

Throughout 1981 and 1982, Tryco's business with CFA and Belk increased. In late 1981, Tryco received general commodity authority to handle all freight for shipping associations. As a result of this, CFA began to worry whether Soots could fulfill a promise he made in 1980 when Tryco began hauling for CFA that priority would be given to CFA's needs. In 1981, CFA indeed began to have problems with Tryco either not having equipment available or not making deliveries on time. By spring, 1981, Tryco began receiving numerous complaints about poor service. CFA members complained about late deliveries, late pickup service and missed pickups. These problems became progressively worse throughout 1982. On some occasions, these problems caused Greater Atlanta Shippers Association to refrain from using

Tryco. Belk submitted numerous claims for damaged goods, slow pickup service, late deliveries, deliveries made to the wrong stores and deliveries not made at all. Ekerds Corporation, CFA's second largest shipper, experienced similar problems and met with representatives of CFA and Soots twice to have them resolved. Belk alleges that Tryco worsened the problems by instructing its drivers to misrepresent to customers why deliveries were late as being due to equipment breakdown or bad weather instead of telling them the trailer did not leave the yard on time. Customers also complained that Tryco's drivers were throwing merchandise off of trucks or otherwise mishandling freight.

Defendants also contend that Tryco attempted to expand its business by taking away members from CFA by a method known as back-solicitation. Back-solicitation occurs when a carrier bypasses an association by soliciting its members' business directly. Jones, then general manager of CFA, complained to Soots about Tryco's back-solicitation of CFA members, Caldor, Magla Products, and Jack Gell Company, and Tryco's unsuccessful back-solicitation attempts of Ekerds. Jones complained the back-solicitation harmed CFA as revenues from its members who dealt directly with Tryco began to disappear. Jones threatened to take away all of CFA's business from Tryco if the practice did not stop. Soots contends that the direct solicitation of CFA members did not constitute back-solicitation because Tryco did not seek work which it was already performing for CFA.

Due to the service problems of Tryco, Barkley, Don Del Vitto, Walt Mills, and Ray Wiburn, founded Tempus Trucking in April, 1982. Hoagland prepared the Articles for Tempus as well as some of its applications for ICC authority. Tempus' application for ICC authority specifically stated that it was to serve as a backup carrier for Tryco. Defendants contend Soots was well aware of the reasons for the formation of Tempus, that is, to provide service to CFA members which Tryco had either fallen behind on or did not have the equipment to handle. Soots told Allan Hughes of Diamond Transporting, when asked what effect Tempus would have on work Diamond was then performing for Tryco, that Tempus was not formed to take any business of Tryco, but to handle only business which Tryco was unable to.

Plaintiffs, on the other hand, claim that Tempus was formed to take business away from Tryco and that there were irregularities in the formation and license of Tempus. Plaintiffs claim that the affidavits filed by Barkley and Hoagland in support of Tempus' applications for ICC authority falsely concealed the true ownership of Tempus. This allegation is not denied.

Tempus operated for about ten weeks, during which time it leased trucks from Walt Mills of Atlanta. Soots agreed with Mills and Jones that if he leased trucks from Mills, Jones would switch Tempus' business with CFA to Tryco and Tempus would shut down. The agreement was carried out and Tempus went out of business.

1982 was Tryco's biggest year with over $7 million in income. During this same time, however, Tryco began to suffer significant cash flow problems. Due to these problems, Tryco terminated its leasing arrangement with Diamond Transporting. By 1983, a number of lessors of equipment to Tryco were demanding past due payments, and threatening repossession if the payments were not made. The situation reached the point where CFA made lump-sum payments directly to Tryco's largest creditor, Commercial Equipment.

Plaintiffs attribute the cash flow problems to the failure of CFA to make timely freight payments, CFA's improper deductions from freight bills, unjustified claims for loss and damage, and by asking for documentation of freight charges an inordinate number of times. CFA contends that any deductions were justified attempts to correct improper over-charges or to claim credits which Tryco had fraudulently tried to prevent CFA from claiming.

Defendants also claim that, even if Tryco's allegations are true, they do not ac-

count for Tryco's real financial problems. From 1980 through 1982, Tryco's expenses increased at a faster rate than its income, according to Tryco's federal income tax returns.

Additionally, Belk contends that at no time did Tryco have any problems collecting money from it. In fact, Tryco began factoring Belk payments through Transport Clearance so that the money could be received on a faster basis and during one period, Belk made daily payments to Tryco. Belk claims that it may have even paid Tryco more than it owed on account of Tryco's alleged fraudulent covering up of credits due Belk.

In 1983, Tryco's service problems worsened. Seven CFA members, including Ekerds, had instructed CFA not to have Tryco carry their freight.

Due to the problems of Tryco, including the alleged back-solicitation problems, Jones and Wyatt Smith, CFA's operations manager, suggested to the Directors of CFA that it form its own transport company. The Directors instructed Hoagland to do just that. CFA Transportation was formed in December of 1982 as a subsidiary of CFA and began to perform some of the work for CFA which Tryco had been doing.

In 1983, CFA tendered its last payment to Tryco. The next month, the State of North Carolina issued a notice that it would garnish amounts allegedly owed by CFA to Tryco to cover Tryco's unpaid taxes. Early in 1984, CFA contacted Hoagland regarding the notice of garnishment and CFA's claims against Tryco for approximately $60,000. Hoagland recommended that merely offsetting these claims against what CFA owed Tryco would be legally insufficient to prevent the garnishment, so CFA sued Tryco.

Hoagland was at the time also representing CFA and Tryco in another lawsuit against Seven Hills. Plaintiffs objected to Hoagland representing Tryco and CFA while at the same time representing CFA against Tryco. Hoagland attempted to withdraw from all representation in the Seven Hills lawsuit, but Soots opposed his withdrawal by means of a letter to the Mecklenburg Trial Court Administrator.

On September 24, 1984, Plaintiffs filed this lawsuit. Two days later, Tryco filed for bankruptcy. On June 3, 1985, CFA and CFA Transportation also filed for bankruptcy.

Plaintiffs' RICO claim alleges that CFA is the enterprise through which the Defendants conducted a pattern of racketeering activity to drive Tryco out of business. Plaintiffs allege Defendants' predicate acts were mail fraud, based upon Hoagland's filing of two allegedly false affidavits for Tempus ICC authority, wire fraud, based upon allegedly fraudulent telephone calls by Hoagland in support of the Tempus ICC application, and extortion, based upon the alleged January 1981 meeting where Barkley demanded 40 percent of Tryco's stock. Plaintiffs seek $1 million in compensatory damages, trebled pursuant to the statute.

Plaintiffs' unfair trade practices claim seeks $1 million in damages, trebled by the statute, upon essentially the same facts as the RICO claim. Plaintiffs claim that Defendants set up Tempus to divert CFA business from Tryco in order to injure Tryco. Plaintiffs also base this cause on CFA's alleged failure to timely pay Tryco, Hoagland's conflicts of interest in representing Tryco, CFA, CFA Transportation and Tempus, and CFA Transportation's hiring of some of Tryco's employees.

All of Defendants, except for Tempus, who has not appeared in this action, moved the Court to dismiss Plaintiffs' claim. After a hearing the Court denied these Motions except as to the RICO claim against CFA; since CFA was alleged to be the enterprise through which the racketeering activity took place, CFA could not be a Defendant as to the RICO claim.

## DISCUSSION

### A. APPLICABLE LAW

Summary judgment shall be granted in favor of the moving party when it is shown

that, in considering the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Taylor v. Chesapeake and Ohio Railway Co., supra.* The law of summary judgment generally requires that the party responding to a motion for summary judgment set forth "countervailing evidence establishing a genuine factual dispute." *See Scooper Dooper, Inc. v. Kraftro Corp.,* 494 F.2d 840, 848 (3d Cir.1974).

The Racketeer Influenced and Corrupt Organizations Act (RICO), Title 18, United States Code, Section 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

For purposes of this statute "racketeering activity" is defined in Section 1961 as meaning

(1) (A) any act or threat ... involving ... extortion which is chargeable under State law and punishable by imprisonment for one year; (B) any act which is indictable under any of the following provisions of Title 18, United States Code ... section 1341 (relating to mail fraud) section 1343 (relating to wire fraud) ... section 1951 (relating to extortion) ...

. . . .

(3) "person" includes any individual or entity capable of holding a legal or beneficial interest in property;

(4) "enterprise" includes any individual, partnership, corporation, association or other legal entity ... or group of individuals associated in fact although not a legal entity;

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity;

. . . .

■ Thus, in order to survive a Motion for summary judgment the Plaintiffs must produce evidence, which when considered in the light most favorable to the Plaintiffs creates a genuine issue as to a material fact, including *legitimate* inference as to: (1) the existence of an enterprise which affects interstate commerce; (2) that the defendants were employed by or associated with the enterprise; (3) that the defendants participated in the conduct of the enterprise's affairs; and (4) that such participation was through a pattern of racketeering activity. *Sedima, S.P.R.L. v. Imrex Company, Inc.,* —— U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

■ "Racketeering activity" includes extortion, mail fraud and wire fraud. 18 U.S.C. § 1961(1). The elements of an indictable offense under the federal mail and wire fraud statutes are: (1) the existence of a scheme to defraud, and (2) the use of the mails or interstate wires in furtherance of the fraudulent scheme. *See* 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud); *United States v. Murr,* 681 F.2d 246, 248 (4th Cir.1982) (the common element of mail fraud cases is that the accused attempted to use the mail as an instrument of his crime); and *United States v. Condolon,* 600 F.2d 7, 8 (4th Cir.1979) (must show a scheme to defraud and use of an interstate communication facility, such as a telephone, to execute that scheme). *See also, Virden v. Graphics One,* 623 F.Supp. 1417 (C.D.Cal.1985). A "scheme to defraud" must seek to deprive one of property through fraudulent or deceptive means, such as material misrepresentation, concealment, breach of duty to disclose information or taking of bribes or kickbacks. *United States v. Pintar,* 630 F.2d 1270 (8th Cir.1980).

■ To prove a violation of extortion under 18 U.S.C. § 1951 or N.C.Gen.Stat. § 14–118.4, the Plaintiffs must show an

attempt to obtain the property of another, with his consent, where such consent was induced by the wrongful use of actual or threatened force, violence or fear. *United States v. Salvitti,* 464 F.Supp. 611, 615 (E.D.Pa.1979). Fear of economic harm satisfies the definition that extortion is the obtaining of property from another with his consent induced by wrongful use of fear. *United States v. Billups,* 692 F.2d 320 (4th Cir.1982).

A "pattern" of racketeering activity "requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5). "[T]wo isolated acts of racketeering activity do not constitute a pattern." *Sedima, supra,* —— U.S. at ——, n. 14, 105 S.Ct. at 3285, n. 14. "'The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern.'" *Id.* (quoting S.Rep. No. 91–817, p. 158 (1969) (emphasis original).

■ As long as more than one racketeering activity is sufficiently alleged, a "pattern" may exist even if the racketeering activities contemplate a single scheme. *See Bank of America Nat'l Trust & Savings Ass'n v. Touche Ross & Co.,* 782 F.2d 966 (11th Cir.1986) (nine mailings and uses of wire over three year period in furtherance of a single scheme are sufficient); *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350, 1355 (5th Cir.1985) (two acts of mail fraud in single scheme dealing with one transaction, if related, are sufficient under *Sedima*). In its discussion of "pattern," neither RICO nor its legislative history refer to "pattern" in terms of "schemes." The statute refers to "acts," two or more of which must be "related" and in "continuity" to constitute a "pattern."

The defendants must have conducted the alleged enterprise "through" a pattern of racketeering activity which requires "proof of some connection between the pattern of racketeering activity and the conducting or operating of the business." *United States v. Mandel,* 591 F.2d 1347 (4th Cir.1979).

■ With respect to pleading the RICO claim, the predicate offenses must be strictly construed. *I.S. Joseph, Inc. v. Lauritzen,* 751 F.2d 265, 267 (8th Cir.1984) (threat to bring action if company did not pay lessee's debt was not threatened "fear" within definition of "extortion" under RICO). Fed.R.Civ.P. 9(b) requires that "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The Plaintiffs must allege with particularity the scheme to defraud and general allegations of such a scheme are not sufficient. *Sellers v. General Motors Corp.,* 590 F.Supp. 502, 506 (E.D.Pa.1984).

■ RICO envisions respondeat superior liability. *Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chicago,* 747 F.2d 384 (7th Cir.1984), *aff'd on other grounds,* —— U.S. ——, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985); *Schacht v. Brown,* 711 F.2d 1343 (7th Cir. 1983), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983); *Morley v. Cohen,* 610 F.Supp. 798 (D.Md.1985) (rules "normally applicable in the criminal realm are equally applicable in RICO cases"); *Bernstein v. IDT Corp.,* 582 F.Supp. 1079, 1083 (D.Del.1984) ("When conduct is proscribed by a federal statute and civil liability for that conduct is explicitly or implicitly imposed, the normal rules of agency law apply in the absence of some indications that Congress had a contrary intent.").

■ Under general agency law, principals are liable for the acts of their agents when their agents act within the scope of their actual or apparent authority. *American Society of Mechanical Engineers v. Hydrolevel Corp.,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982). Apparent authority "is that authority which the principal has held the agent out as possessing or which he has permitted the agent to represent that he possesses; however, the determination of a principal's liability in a particular case must be determined by what authority the *third person in the exercise of reasonable care was justified in believing* the principal had ... conferred upon his

agent." *Zimmerman v. Hogg and Allen,* 286 N.C. 24, 31, 209 S.E.2d 795 (1974) (emphasis added). Any apparent authority that might exist vanishes where the third person knows, actually or constructively, of what the agent is and is not empowered to do for his principal. *Morpul Research Corp. v. Westover Hardware, Inc.,* 263 N.C. 718, 140 S.E.2d 416 (1965).

## B. ANALYSIS

Plaintiffs Tryco and Soots have made two claims against all Defendants: (1) violation of North Carolina's Unfair and Deceptive Trade Practices Act, N.C.Gen.Stat. § 75–1.1; and (2) violation of the Racketeer Influenced and Corrupt Organization statutes ("RICO"), 18 U.S.C. § 1961 *et seq.* For the Court to consider the state law claim, it must first determine whether the RICO claims survive the Defendants' Motion for summary judgment as the aforementioned principles of law are applied to the evidence presented.

The scheme which Plaintiffs allege Defendants carried out in violation of RICO is as follows:

Defendants controlled the trucking freight business for members of the Charlotte Freight Association, of which Belk was the dominant member. Tryco was formed in 1979 to provide trucking service to CFA and its members, including Belk. Its business grew substantially. In January 1981, Young (Belk's general traffic manager) and two other individuals demanded 40% of Tryco's stock from Soots, the sole shareholder of Tryco. Soots refused. Thereafter, Defendants set out to destroy Tryco. Their efforts included nonpayment of bills, unilateral cutbacks of invoices, unjustified freight claims and unjustified detention charges. Also, Defendants established Tempus Trucking Company to take over the Tryco business. Plaintiffs discovered that false affidavits were submitted in support of the Tempus application for ICC operating authority; although Tempus was granted ICC authority anyway, Plaintiffs were able to prevent Tempus from taking Tryco's business. Defendants then formed another company, CFA Transport, and began to shift their business from Tryco to it. Eventually, Tryco was forced into bankruptcy.

(1) Belk's Motion for Summary Judgment.

Plaintiffs admit that to impose liability upon Belk for the acts of Young, Plaintiffs must produce evidence establishing a genuine issue of material fact that Belk was employed or associated with CFA and that Belk participated in conducting CFA's affairs through a pattern of racketeering activity. This means Plaintiffs must produce evidence establishing a genuine issue of material fact that Young's actions with regard to the alleged extortion attempt were within the scope of his authority. Nowhere do Plaintiffs claim that Belk directed Young to participate in the alleged extortion attempt. Thus, Plaintiffs must establish a genuine issue of material fact that Young acted in the scope of his apparent authority. Plaintiffs offer only the deposition testimony of Soots regarding Young's participation in the alleged extortion attempt and summarizes that according to the exhibits and depositions; Young, as general traffic manager for Belk and president and chairman of the board of CFA, spoke for Belk on all matters concerning transportation and that there is, therefore, an issue of fact as to whether Belk is liable for Young's activities. Soots' own memorandum written on the same date as the alleged extortion attempt clearly indicates that Soots did not look to Belk as authorizing Young's alleged participation. "He [Harold Barkley] told me that no one would be involved except the three of them [Harold Barkley, Charles Young, and Ed Redwine]." [Dep. ex. 170.] More importantly, however, is the fact that Plaintiffs have offered no evidence that Soots or anyone else believed that Belk had held Young out as possessing authority to acquire private ownership interests in other companies, much less that a third person in the exercise of reasonable care would be justified in believing such a notion. *See*

*Zimmerman v. Hogg and Allen, supra.* If anything, Soots actually knew that Young was not empowered to acquire ownership interests in private entities on behalf of Belk.

The only sense in which one may attribute to Belk a violation of § 1962(c) is through the principles of agency and *respondeat superior.* The modern justification for the principle that an employer is liable for the wrongs of its employee if the employee acted within the scope of his employment or within his apparent authority are based upon the allocation of risk.

> The losses caused by the torts of employees, which as a practical matter are sure to occur in the conduct of the employer's enterprises, are placed upon that enterprise itself, as a required cost of doing business. They are placed upon the employer because, having engaged in an enterprise, which will on the basis of all past experience involve harm to others through the torts of employees, and sought to profit by it, it is just that he, rather than the innocent injured plaintiff, should bear them; and because he is better able to absorb them, and to distribute them, through prices, rates or liability insurance, to the public and so to shift them to society, to the community at large. [citation omitted]. Thus, when an employer seeks to profit from a business, and in the course of conducting that business torts will occur from time to time, it has been deemed just for the employer to bear the consequences of those wrongs. Those principles apply both to common law torts, *Gleason v. Seaboard Air Line R. Co.,* 278 U.S. [349] 348 [49 S.Ct. 161, 73 L.Ed. 415] (1929), and to a wide range of federal statutory wrongs, occ, c.g., *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556 [102 S.Ct. 1935, 72 L.Ed.2d 330] (1982) (non-profit association held civilly liable for antitrust violations of its agents committed with apparent authority).

*Continental Data Systems, Inc. v. Exxon Corporation,* 638 F.Supp. 432 (E.D.Pa. 1986). The application of the ordinary policy and principles of agency runs contrary to Plaintiffs' assertions of derivative liability on the part of Belk. Plaintiffs have not produced evidence establishing a genuine issue of material fact that Young was acting within the scope of his actual or apparent authority. Therefore, under *American Society of Mechanical Engineers, Zimmerman* and *Morpul Research Corp.,* Belk is entitled to judgment as a matter of law.

**(2) Young's Motion for Summary Judgment.**

To withstand Young's Motion for summary judgment, Plaintiffs must put forth evidence establishing a genuine issue of material fact that Young's participation in CFA was through a pattern of racketeering activity. As stated previously, a "pattern" of racketeering activity "requires at least two acts of racketeering activity" which are related and in continuity. See 18 U.S.C. § 1961(5), *Sedima, supra* —— U.S. at ——, n. 14, 105 S.Ct. at 3285, n. 14. The Court is therefore faced with the question of whether Plaintiffs have produced evidence establishing a genuine issue of material fact as to the alleged extortion attempt, mail fraud and wire fraud or as to at least two of them.

With respect to Plaintiffs' assertion of Young's alleged extortion attempt, Plaintiffs have offered the August 6, 1985 deposition of Soots as evidence of the alleged extortion attempt of Tryco stock by Barkley, Young, and Redwine. The testimony of Soots was that Barkley stated that Soots owed them 40 percent of Tryco Trucking and demanded that Soots turn over the stock to them. Soots further testified that during that meeting he was "scared to death of extortion...." [Soots' dep., Aug. 6, 1985, p. 137.] Soots testified that he felt like they were trying to extort the stock from him and that their actions amounted to threats of taking business away from him. Soots did not testify that Young ever said anything in that meeting about Tryco stock nor have Plaintiffs produced any evidence indicating that Young did anything

more than stand present when Barkley made the alleged extortion demand. Soots has further testified that he called Young a couple of weeks after the January meeting and asked Young what he thought about the previous conversation and that Young responded that "he didn't see anything that would hurt [it]." [Soots' dep., August 6, 1985, p. 135.] Contrary to this testimony, however, is Soots' own memoranda of what happened during the January 1981 meeting when the alleged extortion attempt took place and which Soots prepared himself on January 7 and 8, 1986. [Exhibits 169, 170 from Soots' dep., Jan. 9, 10, 1986.] In those memoranda Soots in no way alludes to threats of extortion, nor does he mention Young's demand of anything but that Harold Barkley stated that they had an option to buy stock in Tryco and that Soots told them he would consider any offer they had to propose. Soots testified that those memoranda represented his best and clearest recollection of what took place in those meetings. [Soots' dep., June 10, 1986, p. 141.] Soots further testified that when Ed Redwine found out he would not get any stock he said he would not make a big deal over it, although he felt he was entitled to it. It was not until four years later that Soots' rendition of this meeting included an attempted extortion. Plaintiffs now assert that Young's participation in that meeting amounted to an extortion attempt and that because Soots refused to transfer Tryco stock, the Defendants set out to destroy Tryco.

To prove a violation of extortion, Plaintiffs must show that Young attempted to obtain Plaintiffs' property, with Plaintiffs' consent, where such consent was induced by the wrongful use of actual or threatened force, violence or fear. *United States v. Salvitti, supra*. Plaintiffs appear to be attempting to raise an issue of fact as to the extortion by Soots' latest testimony which contradicts his own memoranda recorded immediately after the alleged extortion took place. Thus, if there is any issue of fact, it exists only because of Soots' own inconsistent renditions. Therefore, any issues of fact created by

Soots as to the alleged extortion attempt cannot be characterized as genuine. *See, Radobenko v. Automated Equipment Corporation*, 520 F.2d 540 (9th Cir.1975). Consequently, the Court concludes that Plaintiffs have simply not produced any hard evidence establishing a genuine issue of material fact as to the alleged extortion attempt or that Young participated in it.

With respect to Plaintiffs' assertion of Young's alleged commission of mail fraud and wire fraud under 18 U.S.C. §§ 1341, 1343, the Plaintiffs must put forth evidence establishing a genuine issue of material fact of the existence of a scheme to defraud on the part of Young and his participation in the use of the mails or interstate wires in furtherance of the fraudulent scheme. *United States v. Murr, supra; United States v. Condolon, supra; Virden v. Graphics One*, 623 F.Supp. 1417 (D.C.Cal.1985). Plaintiffs must establish a factual issue that Young sought to deprive Plaintiffs of property through fraudulent or deceptive means. *See United States v. Pintar*, 630 F.2d 1270 (8th Cir.1980). Direct evidence of mailing or wire communication is not necessary but circumstantial evidence will suffice. *Virden v. Graphics One, supra* at 1425.

Plaintiffs contend that Hoagland's and Barkley's submission of affidavits to the ICC on behalf of Tempus' application for operating authority wherein they falsely denied that Barkley had any ownership interest in Tempus amounted to a scheme to defraud aimed at Tryco. The Defendants argue that because identity of ownership is irrelevant to the ICC and was not considered by the ICC, the element of materiality is absent. That contention is misplaced in that if Defendants engaged in a scheme to defraud Plaintiffs of their property by submitting false affidavits of Tempus's ownership to the ICC, then what the ICC considers material is itself irrelevant to the question before this Court.

However, Plaintiffs fail to offer any evidence that Young participated in a scheme to defraud or that he participated

in the use of mails or interstate wires in the furtherance of such a scheme. It is undisputed that the affidavits submitted by Hoagland and Barkley falsely deny Barkley's ownership interests in Tempus trucking. However, nowhere does the evidence show that Young even knew of these affidavits, much less that he authorized or encouraged Hoagland's sending them. Young certainly did not sign them. Moreover, there is no evidence of what was even said in the purported telephone calls of Hoagland to the ICC in furtherance of the Tempus ICC applications. The Plaintiffs have merely shown that Hoagland submitted bills for his services in June and July of 1982 and that these bills show that such calls were made to the ICC. There is no indication that Young was involved in that at all. At best, Plaintiffs have shown that Young had a minority interest in Tempus. That, however, is a long way from producing evidence which establishes a genuine issue of material fact that Young schemed to defraud Tryco by the actions of Hoagland and Barkley and that he participated in the use of the mails or interstate wires to that end.

Consequently, the Court concludes there exists no genuine issue of material fact that Young's participation in CFA was through a pattern of racketeering activity and Young's Motion for summary judgment should be granted.

(3) Hoagland's Motion for Summary Judgment

■ To withstand Hoagland's Motion for summary judgment, Plaintiffs must put forth evidence establishing a genuine issue of material fact that Hoagland participated in the affairs of CFA through a pattern of racketeering activity. Plaintiffs have never averred that Hoagland participated in the alleged extortion attempt. Even if Hoagland filed false affidavits on behalf of the Tempus ICC application, Plaintiffs have failed to show any evidence of a scheme to defraud, much less evidence of how Hoagland's conduct was part of a scheme to defraud Plaintiffs of their property. In-

stead, Plaintiffs' evidence shows that Tempus was formed to serve as a back-up carrier for Tryco, that Soots was aware of that fact, as evidenced by his statement to Allan Hoagland to that effect, that Soots unsuccesfully opposed Tempus' ICC application, and that Tempus went out of business in accordance with an agreement between Soots, Walt Mills, and John Jones. There is simply no evidence, however, establishing a factual issue of "a scheme to defraud," without which the violations of mail fraud and wire fraud cannot be said to exist. Thus, Plaintiffs have not produced evidence establishing a factual issue that Hoagland participated in the affairs of CFA through a pattern of racketeering activity and Hoagland's Motion for summary judgment should be granted.

(4) CFA's Motion for Summary Judgment

CFA contends that the Plaintiffs' first claim for relief for unfair trade practices should be dismissed for a lack of subject matter jurisdiction. The reason for CFA's contention is that the Court has already dismissed Plaintiffs' RICO claim against it and that the Court would have no subject matter jurisdiction over the unfair trade practices claim if it were not for the pendent jurisdiction conferred by the federal RICO claim. Thus, there is now no federal claim pending against CFA, but only the state claim. *See Reamer v. United States,* 459 F.2d 709 (4th Cir.1972) (when federal claim is dismissed prior to trial, the state claim should be dismissed as well).

■ The Court is of the opinion that CFA is correct in its contention and, therefore, summary judgment should be granted in favor of CFA since the federal claim has been dismissed and there is no compelling reason to allow the state cause of action to proceed.

**CONCLUSION**

In conclusion and to sum up, taking all the Plaintiffs' evidence as true, and in the light most favorable to the Plaintiffs:

### (1) As to Belk.

Belk was one of the largest members of CFA. Belk's General Traffic Manager Young was President and Chairman of the Board of CFA and Young actually managed the day-to-day operations of CFA along with CFA's General Manager Harold Barkley. Soots testified Barkley (a non party) demanded 40% of Tryco Trucking be turned over "to us." Young was present when the demand was made. Soots was "scared to death of extortion during that meeting." Nobody ever threatened Soots, but there were threats that business would be taken away from Soots (Tryco) and "Charlie Young told me that they were taking all the Belk Florida freight away from me because of back solicitation" and Soots "thinks" business was taken away from him because he "didn't give them ownership interest in Tryco Trucking" and that Belk Stores and CFA took the business away and Soots thinks "the very first step was Belk Stores changed some runs on me, they even took some runs and took the drivers with it. They even rented the same trucks I was using when Commercial took them back in."

Assuming, *without deciding,* as the Plaintiffs contend, that the Plaintiffs' evidence, if believed by the jury, "is clearly sufficient to support an issue of attempted extortion," there is absolutely no evidence that Belk in any way even knew of the purported demand by Barkley that the Plaintiffs turn over 40% of Tryco to Barkley and Young. Clearly such a demand was not within the scope of the authority of Young. *White v. Hardy,* 678 F.2d 485, 487 (4th Cir.1982).

There is absolutely no evidence that Belk had any association or even knowledge of Barkley and Hoagland's alleged mail fraud and wire fraud.

Therefore, Belk is entitled to judgment as a matter of law.

### (2) As to Young.

Again, assuming *without deciding,* that the Plaintiffs' evidence would constitute attempted extortion by Young, there is abso-lutely no evidence that Young even knew of Barkley's and Hoagland's alleged fraudulent use of the mails and interstate telephone lines in the ICC applications on behalf of Tempus, and clearly there is no evidence that he authorized or participated in the alleged mail fraud and wire fraud, and Defendant Young's Motion for summary judgment will therefore be granted since there is no evidence of a "pattern of racketeering activity" as that term is defined in Title 18, Section 1961(5), or conducted or participated directly or indirectly in CFA's affairs through a pattern of racketeering activity or prohibited in Title 18, Section 1962(c).

### (3) As to Hoagland.

One of the elements required to constitute a violation of Title 18, Section 1341 (mail fraud) and Section 1343 (wire fraud) is "a scheme to defraud." (In this case the Plaintiffs).

In Plaintiffs' response to Motions for summary judgment the Plaintiffs contend: "CFA is the enterprise through which the racketeering activity took place."

The Plaintiffs allege in their Complaint:

(54) During all the activities described in the previous paragraphs, Robert D. Hoagland was intimately involved in the affairs of CFA and served as its attorney.

(55) Furthermore, Mr. Hoagland represented CFA Transport and Tempus Trucking in their application before the ICC.

(56) Mr. Hoagland had also represented and served on the Board of Directors of Tryco Trucking. By virtue of his multiple affiliations with the parties to these transactions, Mr. Hoagland was in a unique position to receive valuable information concerning the financial status of Tryco. He was also well aware of the conflicting interests and positions of CFA Transport and Tempus, on the one hand and Tryco on the other.

Assuming that Hoagland mailed applications to the ICC on behalf of Tempus which contained false written statements, and that he twice sued Tryco while at the same time representing Tryco, all of which on its face would be reprehensible conduct on the part of Defendant Hoagland, it does not amount to conducting or participating directly or indirectly, in the conduct of CFA's affairs through a pattern of racketeering activity, which requires at least two acts of racketeering activity.

 "Racketeering activity" means, among other things, a violation of the mail fraud and wire fraud statutes. The term "scheme to defraud" includes within its ambit various schemes involving deception if they are contrary to public policy and fail to measure up to accepted moral standards. Schemes of non-disclosure and concealment of material information come within the federal mail fraud statute. Fraud is also found when there has been a fraudulent statement of facts or a deliberate concealment thereof to a public agency in order to receive a benefit by action of the agency. *Tryco Trucking Co. v. Belk Stores Services, Inc.*, 608 F.Supp. 812 (D.C.N.C.1985), citing *United States v. Mandel*, 591 F.2d 1347, 1364 (4th Cir.1979).

Plaintiffs' Complaint alleges:

"70(a) In 1982, Defendants Charles R. Young and Robert D. Hoagland, together with D. Harold Barkley, Dan DelVitto, Walter Mills, and Ray Wilburn, incorporated Tempus Trucking Company.

(b) A scheme was devised whereby the true ownership interest of Defendants Charles R. Young, D. Harold Barkley, and Don DelVitto would be hidden.

(c) Charlotte Freight Association, at the direction of Charles R. Young, offered evidence. in support of a contract carrier application filed by Tempus Trucking with the Interstate Commerce Commission.

. . . .

(e) Attorney Robert D. Hoagland also submitted a sworn statement dated August 20, 1982, known by him to be false. Those statements denied any financial interest in Tempus Trucking Company by D. Harold Barkley."

The Complaint further states in Paragraph 35:

"35. Mr. Robert D. Hoagland, is representing Tempus Trucking Company before the Interstate Commerce Commission. . . ."

If "CFA is the enterprise through which the racketeering activity took place;" as contended for by Plaintiffs, (See ¶ 2(a) Plaintiffs' Response to Motions for Summary Judgment and Letter from Eric Meierhaefer, Plaintiffs' counsel, dated February 26, 1985) then Hoagland's alleged false statements in the ICC application on behalf of Tempus would not come within the prohibited activities under Title 18, Section 1962(c) since he was not participating directly or indirectly in the conduct of such enterprise's affairs. "The government must show that a person 'is enabled to commit the predicate offense solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise; or . . . the predicate offenses are related to the activities of that enterprise.' " *United States v. Jannotti*, 729 F.2d 213 at P. 226. (3rd Cir.1984).

Therefore, Hoagland's Motion for summary judgment will be granted.

Since Plaintiffs' federal claims fail, then Plaintiffs' state law claims for unfair and deceptive trade practices should be dismissed for lack of jurisdiction. The remaining outstanding Motions in this case deserve no further consideration in light of this Judgment.

Based upon the foregoing Memorandum of Decision, the Court will simultaneously enter Judgment in favor of Defendants.